**O.M.I. CORPORATION OF AMERICA, a corporation of New York, and Ottico Meccanica Italiana E Rivelamenti Aerofotogrammetrici S. p. A., a corporation of Italy, Appellants,**

v.

**KELSH INSTRUMENT COMPANY, Inc., a corporation of Maryland, Appellee.**

No. 7979.

United States Court of Appeals Fourth Circuit.

Argued Jan. 6, 1960.

Decided May 30, 1960.

**580**

Robert F. Davis, Washington, D. C. (John H. Lewis, Jr., Washington, D. C., on brief), for appellants.

Albert J. Kramer, Washington, D. C., for appellee.

Before SOBELOFF, Chief Judge, and SOPER and BOREMAN, Circuit Judges.

SOPER, Circuit Judge.

This appeal is taken from a declaratory judgment in which it was adjudged that United States Patent No. 2,492,870 for a stereoscopic projection map making instrument issued to Harry T. Kelsh and owned by Kelsh Instrument Company, Inc., a Maryland corporation, is valid and had been infringed by O. M. I. Corporation of America, a New York corporation, and Ottico Meccanica Italiana E Rivelamenti Aerofotogrammetrici S. p. A., an Italian corporation.

Ottico has been engaged in Rome in the manufacture and distribution of photogrammetric plotting apparatus for many years under the control of Umberto Nistri, an expert in the field. Harry T. Kelsh, the patentee, has been similarly engaged in the same field in Baltimore, Maryland, and was the founder of the Kelsh Instrument Company to whom the patent was conveyed. After the issue of the patent Ottico and O. M. I. began to manufacture and import into the United States an apparatus for making contour maps from aerial photographs which involved the methods outlined in the patent and Kelsh thereupon initiated action before the United States Tariff Commission under 19 U.S.C.A. § 1337 to bar the importation of the Ottico instruments into the United States on the ground that they infringed the claims of the patent. Thereupon O. M. I. and Ottico brought the present suit against Kelsh and his corporation, seeking an adjudication that the patent was invalid and not infringed by them. Kelsh filed an answer and a counterclaim, charging that the plaintiffs had infringed the patent and prayed a permanent injunction and an accounting for damages. During the course of the suit in the District Court the plaintiffs conceded that if the patent is valid it is infringed by the Ottico instruments, but contended that the patent is invalid. Judge R. Dorsey Watkins, after an exhaustive study, held in a carefully prepared opinion (D.C., 173 F.Supp. 445) that Claim 1 of the patent, the only claim in suit, is valid and gave judgment on the counterclaim and dismissed the plain-

tiffs' suit. It is from this judgment that the present appeal is taken.

Claim 1 of the patent is as follows:

"An instrument for making maps by stereophotogrammetric methods, comprising a pair of projection lanterns each having a lens and slide-receiving means and supported side by side for projecting superimposed images of a pair of consecutive slides, a moveable plotting table having a screen on which the images are projected for viewing to give a stereoscopic model, a point light source for each lantern and a light condenser to converge the light rays through a small area of the side and to a point coincident with the nodal point of the lens and diverge the light rays to cover approximately the screen of the plotting table, each of said light source and light condenser being moveably mounted relative to the lens in such manner that substantially the entire area of the slide in each lantern may be traversed by the converging light rays, and means for moving each light source and its light condenser so attached to the plotting table that as the plotting table is moved about, the light source and condenser move in a manner to maintain the image on the screen and to maintain the point of convergence of the light rays coincident with the nodal point of the lens."

The basic idea underlying the photogrammetric art is to take photographs of an object from two or more points of view so that by comparison a reconstruction of the object in three dimensions becomes possible. The most important commercial use of the art is in mapping. Aerial photographs are taken from an airplane flying at an altitude of several thousand feet. The photographs are mounted for projection on photosensitive glass plates called diapositives. Successive overlapping diapositives are projected and when two plates are simultaneously viewed after correct orientation relative to one another a three-dimensional model of the surface of the ground is reconstructed in the mind of the observer. By the use of a mark in connection with the model it is possible to measure relative altitudes or to make linear tracings indicating all the points within the photographed area having a common altitude.[1]

Numerous viewing or projecting instruments operating under the same optical principles have been constructed and used in the prior art from time to time and after improvement have been superseded by others. When Kelsh came into the field he found that the instrument in most common use in the United States was the Bausch and Lomb Photomultiplex. It was, however, not entirely satisfactory because it required the reduction in size of the 9 inch by 9 inch negative photographic plate used in the aerial camera to a 2 inch by 2 inch diapositive, thereby reducing the mapping scale detail and accuracy to such an extent that it was not usable in certain types of work and, consequently, the expense incidental to the making of a complete map was increased. Kelsh devised a machine similar to the Multiplex but capable of using larger diapositives and obtained patent No. 2,451,031 thereon on October 12, 1948. Although the new machine embodied some improvement over the Multiplex it was not commercially satisfactory because the lenses and the light sources required for the illumination of the 9 inch by 9 inch diapositives were large, heavy and expensive. Kelsh thereupon continued his investigations and produced the device disclosed in the patent in suit. Therein he reduced the size and weight of the projecting lanterns by using light sources which swung about small projecting lenses in the lan-

[1.] The diapositives may be viewed by transmitted light by looking directly into the lens of the projector (direct viewing) or the projected image may be observed on a screen by diffused light (projection). In the Kelsh patent the diapositive is projected on the screen.

terns so as to illuminate only those portions of the diapositives which were being projected for plotting on the mapping table below. He accomplished this by swinging or pivoting the light sources around the projecting lenses, focusing the light by condensers and connecting the housing of the light sources and condensers by pivot links to the mapping table. This device was the basis for the patent in suit, of which Fig. 1 is depicted below.

*Fig. 1 is a front elevation of the instrument with parts broken away for clarity.

In the drawing, the main framework is shown (11, 12, 13, 15). There is a drawing board (18) upon which rests the plotting table (125). The plotting table bears a screen (129) upon which superimposed images are projected by the projection lanterns (25, 26). The plotting table is connected to the light-light condenser housing (shown as unnumbered cylindrical objects above the projection lanterns) by telescoping rods (133, 134) and light supporting brackets (110, 135). Diapositives (40) are mounted on supports (41-45) between the light sources and the projection lanterns so that the line through the point light source, the nodal point of the projection lens, and the center of the screen constitutes a common axis.

The various knobs near the projection lanterns allow the operator to make compensatory changes in the orientation of the diapositives so that the true orientation of objects on the ground will be reconstituted on the screen.

All of the elements of this structure, as the inventor admits, may be found in the prior art and hence the validity of the patent depends upon whether these elements have been put together in such a manner, not obvious to a person skilled in the art, as to produce a new and better result and thus to justify the issuance of the patent under the established rule. Black & Decker Mfg. Co. v.

Baltimore Truck Tire Service Corp., 4 Cir., 40 F.2d 910, 912; Western Electric Co. v. North Electric Co., 6 Cir., 135 F. 79. In the District Court the plaintiffs, in order to bear the burden of proof imposed by the statute, 35 U.S.C. § 282, upon one who attacks the validity of the patent, cited a number of prior art photogrammetric plotting devices as well as prior patents in this field, all of which were discussed by Judge Watkins in his opinion. On this appeal the plaintiffs rest their argument of invalidity largely, if not entirely, upon what is called the Gallus-Ferber device and upon patent No. 2,085,498 issued to E. Hörner on June 29, 1937; and their contention is that since the disclosures of these devices were available it required no invention to devise the Kelsh instrument.

The Gallus-Ferber machine was said by the plaintiffs' expert in the District Court to be the closest device to Kelsh in the prior art. Its present form is attributed to Nistri. It employs two projectors and condensers, and movable lights are used which illuminate only the portion of the negatives visible on the screen. It differs from the Kelsh instrument, however, in important particulars. The two projection lanterns which it uses are equipped with lenses identical with those used in taking the photographs from a great distance above the earth, and consequently it is necessary to shorten the focal distances in the operation of the instrument. To accomplish this purpose a secondary lens system is introduced which intersects the emerging projected ray and brings the image into focus at the mapping table. The Kelsh system, on the other hand, uses a lens which is different from that used in the camera and is capable of focusing the image on the plotting table without the intervention of a secondary system so that the instrument and the operation of the system is simplified. In addition, the Gallus-Ferber device uses a flicker system by which the images from each projector are alternately blanked out. Consequently the two projectors never project at the same time, no stereoscopic model is produced on the plotting table and the viewing is monocular.

Both of these differing factors are elements of the claim in suit wherein it is said that the instrument is used for making maps by stereophotogrammetric methods comprising a pair of projection lanterns, each having a lens supported side by side for projecting superimposed images of a pair of consecutive slides and a movable plotting table having a screen on which the images are projected for viewing to give a stereoscopic model. There is no mention in the claim or in the figures of the patent of a secondary system for reducing the focal distance of the lens, and it is obvious that a lens capable in itself of projecting sharp images on the plotting table is used. It was suggested in the court below that the Gallus-Ferber machine might be operated stereoptically if the operator should don a pair of spectacles with rotating shutters synchronized with those of the projectors. The judge, however, pointed out that in order to accomplish with Gallus-Ferber what can be done with Kelsh, it would be necessary to:

(1) Eliminate the flicker and have both projectors on constantly and simultaneously, and projecting superimposed images.

(2) Insert red and green filters in the projectors.

(3) Increase the illumination.

(4) Equip the operator with glasses having a red and a green filter.

(5) Remove the auxiliary lens systems.

(6) Use shorter length focal lenses for projecting.

(7) Use both eyes in viewing.

It is obvious that most of the items in this list relate to specific elements of the patented structure which differentiate Kelsh from Gallus-Ferber.

What the Hörner patent teaches it is hard to say. The District Judge in his opinion found it difficult to interpret and the experts for the opposing sides are in direct conflict as to its disclosures. We share the general confusion. Seemingly

Hörner contemplated as one of its methods direct optical viewing without a screen, which Kelsh does not employ. With respect to the patent it is perhaps sufficient to say that even if it speaks clearly enough to be understood by a person skilled in the art, a doubtful matter to say the least, and even if it includes some of the features of Kelsh, it does not portray the combination which Kelsh sets forth.

■■ Since the combination was new it remains to determine whether it embodies patentable invention. That it represents a simplification of previous devices which is useful and effective is admitted, but that of itself is not enough, for "the conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable." Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162. "The touchstone is whether the new thing is beyond the ability of the worker of ordinary skill in the field, and neither the courts nor Congress have been able to offer a more definite test." Interstate Rubber Products Corp. v. Radiator Specialty Co., Inc., 4 Cir., 214 F.2d 546, 548. The rule was restated in the revision of the patent statute by Congress in 1952, 35 U.S.C. § 103, where it is provided that a patent may not be obtained although the invention was not previously disclosed if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains.

■■ On the other hand, knowledge after the event is always easy and problems once solved present no difficulties, so that it frequently happens that invention may be inferred when persons experienced in an active field do not perceive the possibilities of improvement and change until they are disclosed in the publication of a patent. Colgate-Palmolive Co. v. Carter Products, 4 Cir., 230 F.2d 855, 861. Such was found to be the situation by the District Judge in the pending case. The field was an active one and men of first-rate ability, including Nistri himself, a recognized leader, had been busy in it for many years. Specifically, the Gallus-Ferber device had been used for a long time and the Hörner patent was granted in 1937, but it was not until Kelsh made his invention and manufactured his device that Nistri recognized its advantages and paid it the tribute of imitation. Under these circumstances, we find substantial ground for the final conclusion stated by the District Judge in the following language [173 F.Supp. 459]:

"Now that the Kelsh combination has succeeded it is argued that it is obvious. But it was not obvious to Zeiss, Bausch and Lomb, or Nistri, leaders in the optical and photogrammetric field. The Kelsh combination far transcends the art of a skilled mechanic, and in the court's opinion, and it so finds, amounts to a genuine invention."

■■ The appellants urge as an additional reason for reversal of the judgment that the District Judge refused to reopen the case for the taking of additional testimony. After the decision but before the judgment was rendered the plaintiffs below moved to reopen the case in order to take the testimony of Nistri, the founder of the plaintiffs' corporations, who sat in the courtroom throughout the trial but was not called to the stand. During the course of the trial, in a discussion at the end of the plaintiffs' case, the judge commented on the failure of Nistri to testify and explain, if he could, that no modification of his instruments had taken place after the Kelsh invention. Nistri's attorney then explained that he was not put on the stand because he did not speak English and it was very difficult to understand him through an interpreter. Subsequently the judge stated in his opinion that he had been strongly impressed by the failure of Nistri to testify on this

subject. Thereafter the motion to reopen the case was filed, accompanied by an offer of proof of what the witness would testify. The judge carefully considered the proffer and reached the conclusion that it was merely cumulative and would add nothing to the evidence offered at the time of the trial. He therefore overruled the motion. Since the matter was clearly one within the discretion of the court and careful consideration was given to the possible effect of proffered testimony, there was no error in denying the motion.

Affirmed.