## CHESAPEAKE & O. RY. CO. v. KALTENBACH et al.

### No. 4270.

Circuit Court of Appeals, Fourth Circuit.

April 5, 1938.

Edwin P. Corbett, of Columbus, Ohio (Corbett & Mahoney, of Columbus, Ohio, Williams, Loyall & Taylor, of Norfolk, Va., John J. Mahoney, of Columbus, Ohio, and Leigh D. Williams, of Norfolk, Va., on the brief), for appellant.

Albert R. Teare, of Cleveland, Ohio (Bates, Golrick & Teare, of Cleveland, Ohio, Herbert G. Smith, of Newport News, Va., and Albert H. Bates, of Cleveland, Ohio, on the brief), for appellees.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

NORTHCOTT, Circuit Judge.

This is a suit in equity brought in August, 1934, in the District Court of the United States for the Eastern District of Virginia, at Norfolk, by the appellees, Robert W. Kaltenbach, a citizen of the state of Ohio, and R. W. Kaltenbach Corporation, an Ohio corporation, here referred to as the plaintiffs, against the Chesapeake & Ohio Railway Company, a Virginia corporation, here referred to as the defendant. The object of the suit was to recover damages caused by the erection and use, by the de-

fendant, of a certain car dumper used for loading ships with coal at one of the defendant's piers at Newport News, Va. It was claimed that the car dumper infringed certain patents owned by the plaintiff company and that the plans for the erection of the dumper were given the defendant in confidence with the stipulation that they should not be used unless the contract to build the dumper was given the plaintiff corporation. The defendant filed an answer denying the allegations of the complaint. Both complaint and answer were amended and evidence was taken by deposition and in open court. On May 27, 1937, the judge below filed a memorandum opinion finding for the plaintiffs and on July 23, 1937, entered an interlocutory decree to that effect and referring the matter to a special master to take and report an account of the gains, profits, and advantages which had accrued to the defendant by virtue of its infringements of plaintiffs' patents and the wrongful use of plaintiffs' plans in the erection of the dumper. From this decree, the defendant appealed.

In May, 1930, the defendant requested bids for the erection of a car dumper, on one of its piers at Newport News, for loading coal as cargo on ships. Bids were submitted by several manufacturers of dumpers, including the plaintiff corporation and the Industrial Brownhoist Corporation of Bay City, Mich., here referred to as Brownhoist. The specifications prepared by the defendant, for the proposed car dumper, followed along general lines the designs of a car dumper built for the Philadelphia & Reading Railway, near Philadelphia, known as the Port Richmond dumper. Brownhoist's first proposal to the defendant stated that "the enclosed proposition is similar to the Port Richmond machine." This dumper was built about the year 1924 and was referred to by Brownhoist in the correspondence, leading up to its bid, as the best dumper in use at that time, and a similar machine was recommended to the defendant by Brownhoist. Proposals for the erection of the dumper were submitted by both Brownhoist and Kaltenbach on May 26, 1930.

Accompanying the Kaltenbach proposal were certain plans and specifications which Kaltenbach claimed were a great improvement over the Port Richmond dumper, which was built by the McMyler Interstate Company of which company R. W. Kaltenbach was an officer and employee at the time of its building. The McMyler Company went into bankruptcy in 1929. The two main improvements claimed were a pan extension structure connecting the pan of the dumper with the chute, leading to the holds of the vessels to be loaded, and a motor arrangement for moving the chute. At the time of filing the proposal with the defendant Kaltenbach had made no application for patents for either of these devices. In the letter transmitting its proposal to the railway, Kaltenbach called attention in detail to these two new devices and submitted drawings. On these drawings was plainly printed the following:

"This drawing is the property of R. W. Kaltenbach Corporation. It shall not be copied or duplicated in any manner, and shall not be submitted to outside parties for examination without our consent. It shall be used for reference to work under contract or proposals submitted by this corporation only."

> "R. W. Kaltenbach Corporation,
> "Consulting and Contracting Engineers
> "Mail Address, Bedford, Ohio."

By a letter dated July 2, 1930, the railway acknowledged the receipt of the Kaltenbach proposal but added that, as a more favorable proposal was received, the work had been let elsewhere. Kaltenbach replied to this letter July 7, 1930, and requested the return of the Kaltenbach proposal, including the extra blueprints submitted therewith. To that letter the railway replied on July 23, 1930, that the proposal and blueprints were part of its supporting papers and that it was not its practice to return such papers. To this Kaltenbach responded by letter dated July 29, 1930, saying:

"We naturally feel that inasmuch as our proposals covering the coal pier equipment were not of sufficient interest to warrant a personal discussion with your organization covering what we had to submit, they would be of little or no value to you.

"The proposal and plans submitted embody considerable new thought and development of which we are more or less jealous. The development represents our own thought and effort as the result of years contact in car dumper design and is not to be used for the benefit of others.

"It is desired that you comply with our request as indicated to you in our letter of July 7th."

The railway did not comply with these requests for the return of the Kaltenbach proposal and blueprints. The plans submitted with Kaltenbach's proposal were brought into the court at the trial in response to a subpoena duces tecum.

About June 9, 1930, plaintiff Kaltenbach went to Virginia and had a conference with the chief engineer of the defendant and testified at the trial that, at that time, he left two additional drawings illustrating his proposed improvements over the Port Richmond dumper. These drawings were not produced by the defendant and it was testified that all the drawings had been produced that could be found. Later, in the course of the trial, one of the drawings was produced and it was explained that it had been turned over to the legal department in preparation for the trial.

At the time the contract was stated to have been orally given to Brownhoist it was apparently based on and closely followed the plan of the Port Richmond dumper. On September 3, 1930, Brownhoist submitted to the railway a drawing corresponding to the pan extension arrangement, as finally used in the Newport News dumper as constructed, and on October 29, 1930, another drawing was submitted, dealing with the pan extension.

On December 26, 1930, a written contract was entered into between the defendant and Brownhoist for the erection of the dumper at the cost of $517,800, "in conformity with Brownhoist drawings Nos. 173,144-B and 173,144-A dated October 29th, 1930, and Brownhoist's specification dated May 23rd, 1930, and the attached portion of the Railway Company's specification dated May. 8th, 1930, all hereunto attached and made a part hereof." The contract price of Brownhoist's bid of May 26, 1930, of $491,000, in which bid no provision was made for the inclusion of the alleged infringing devices, was increased.

The contract between the railway and Brownhoist provides that Brownhoist shall indemnify and save harmless the railway from all claims for infringement or alleged infringment of patents or patent rights entering into the construction or use of said dumper and that the railway shall give notice to Brownhoist of such claims in order that Brownhoist may defend such claims. Brownhoist has actively defended this suit in compliance with this provision of the contract.

Plaintiff Kaltenbach testified that he first saw the Newport News dumper when it was nearing completion, late in the year 1931, but gave no notice to the defendant at that time that there was any infringement claimed by him.

On December 5, 1930, plaintiff Kaltenbach filed his application for a patent covering his electrical chute control arrangement and the patent (No. 1,876,686) was granted to him September 13, 1932. On October 1, 1932, defendant was notified of plaintiff's claim of infringement of this patent.

On January 2, 1931, Kaltenbach filed his application for a patent covering the pan extension and the patent (No. 1,920,402) was granted to him on August 1, 1933. On August 7, 1933, defendant was notified of the claim of infringement of this patent. Both these patents were issued to the plaintiff R. W. Kaltenbach, and assigned by him to plaintiff R. W. Kaltenbach Corporation.

On November 29, 1933, Ernest W. Taylor, vice-president of Brownhoist, and one of the witnesses in the suit, filed an application for a patent on the pan extension copying the claims in suit. in patent No. 1,920,402, and asked that an interference with Kaltenbach patent No. 1,920,402, be declared. The interference was declared and preliminary statements were filed by both parties, but Taylor abandoned his application and the Patent Office awarded a judgment of priority in favor of Kaltenbach.

In January, 1934, plaintiffs brought a suit in equity against the defendant and Brownhoist in the District Court of the United States for the Northern District of Ohio, making charges similar to those made in the present suit. This suit was dismissed as to the defendant for want of jurisdiction, and was later dismissed as to Brownhoist.

It is contended on behalf of the defendant that: (1) Both Kaltenbach patents Nos. 1,876,686, and 1,920,402, are invalid for lack of invention and because of the prior art; (2) that if valid the patents are not infringed by any of the arrangements used in the Newport News dumper of the defendant; and (3) that there was no use made by the defendant of the Kaltenbach plans in the building of the Newport News dumper.

As detailed by the judge below the dumper is used in transferring coal from cars to the hold of a vessel, in the following manner:

"The coal dumper which is the subject of this controversy was erected on the Rail-

way's pier No. 4 in 1930–1931. A brief explanation of the steps incident to transferring coal from cars to the hold of a vessel may be helpful in considering the questions of alleged infringement which are involved in this controversy.

"A car loaded with coal is run onto a cradle. There the wheels rest upon a table which has tracks aligned with those at the approach and runoff ends of the cradle. After a car is placed upon the platen of the cradle and clamped, the cradle is elevated until it reaches the point where it is to be tipped. The car is then tipped so that the coal flows therefrom into a pan. After being tipped and emptied the car is righted on the tracks of the cradle, released and started on its way to the yards. * * *

"At the end of the pan and extensible member the coal passes into a telescopic vertical chute and is directed therefrom as desired into the hold of the vessel."

Kaltenbach patent No. 1,876,686, is for an arrangement to control the chute so as to facilitate the disposition of the coal as it is loaded into the hold of the vessel. This is accomplished by means of an arrangement of four cables attached to drums operated by four electric motors, one of the cables being attached at each corner to the lower end of the chute. Switches are provided for actuating these motors in groups so that each switch sets in operation two motors, retracting or paying out the cables controlled by the motors as may be desired. By these means the chute can be readily moved fore or aft and toward or away from the pier.

When Kaltenbach filed his application for this patent the Patent Examiner rejected all the claims on the Kelly patent, No. 1,449,-759, and Case patent, No. 1,442,521. Kaltenbach amended his claims but the patent was again rejected by the Examiner. Kaltenbach again amended his claims and the patent was allowed as limited by the amendments.

■■■ An examination of the Kelly and Case patents shows that neither has the feature, embodied in the Kaltenbach patent, of a mechanism operating the motors in pairs so that two motors could pull while the other two released their cables and also allowing the placing of the motors in different groups to effect the swinging of the chute either fore or aft and toward or away from the pier. The Port Richmond dumper did not have any control mechanism similar to that embodied in the Kaltenbach

patent. A patent is prima facie valid (Parks v. Booth, 102 U.S. 96, 26 L.Ed. 54; Lehnbeuter v. Holthaus, 105 U.S. 94, 26 L.Ed. 939), and the presumption of validity is strengthened where, as here, the principal references urged against the patent have been considered by the Patent Office. As we said in Gulf Smokeless Coal Company v. Sutton, Steele & Steele, 4 Cir., 35 F.2d 433, 437: "Prior patents relied upon as anticipations were carefully considered [by the Patent Office], and numerous changes were made in the claims before the patents were finally issued. It is well settled that in such case the presumption of patentability arising from the issuance of the patent is greatly strengthened."

■■■ It is apparent to us that the Kaltenbach patent was a distinct advance in the art that possessed many advantages and arose to the dignity of an invention. Because an idea, once demonstrated, seems simple, it does not follow that it only involves mechanical skill and is not an invention. As was said by Mr. Justice Story in Ryan v. Goodwin, 3 Sumn. 514, Fed.Cas. No. 12,186: "The combination is apparently very simple; but the simplicity of an invention, so far from being an objection to it, may constitute its great excellence and value."

■ It is contended that the chute control mechanism, used in the Newport News dumper, operates in a way that gives better results than does the Kaltenbach mechanism and that the arrangement of the switches is different, but we are of the opinion that the defendant has used the idea of the Kaltenbach patent in a manner that infringes. It is no defense that an infringing device is an improvement, if the novel features found in the patent have been adopted.

■ "If the infringing device performs the same function as the patented device, it is immaterial that it also performs some other function. It is still none the less an equivalent of the patented device, and an appropriation of the patented invention." Comptograph Co. v. Mechanical Accountant Co., 1 Cir., 145 F. 331, 338. See, also, Ives v. Hamilton, 92 U.S. 426, 23 L.Ed. 494; International Time Recording Co. v. W. H. Bundy Recording Co., 2 Cir., 159 F. 464; Norton v. Jensen, 9 Cir., 49 F. 859, and cases cited.

Apparently the chute control mechanism of the Kaltenbach patent and that used in

the Newport News dumper produce substantially the same results and are essentially the same.

Kaltenbach patent, No. 1,920,402, involves an extension or connection between the pan into which the coal is dumped from the car ·and the chute through which the coal empties into the hold of the vessel. This connection was made by means of telescopic rings that could be extended or retracted at will leaving the angle at which the coal ran from the pan to the chute such as to cause the coal to slide or run smoothly without any fall or drop. It is contended that this patent is invalid as being anticipated in the prior art as shown in a number of patents cited, and by the Port Richmond dumper. An examination of the Kaltenbach patent shows that the telescopic rings, used in extending the pan so as to connect the pan with the chute, were a distinct advance over the connections used in the prior patents cited and the connection used in the Port Richmond dumper, and were a valuable contribution to the art. More than mechanical skill was involved in the Kaltenbach idea for the pan extension and we are of the opinion that it possessed the advantages claimed for it by the plaintiffs. Certainly, the elimination of the drop or fall of the coal,· from the pan to the pan extension, that was present in the Port Richmond dumper, prevented the breaking up or degradation of the coal. It is shown that the Kaltenbach patent reduces materially the height to which the car, to be dumped, must be elevated, with a consequent saving in time and expense in the operation of the dumper.

As was the case with patent No. 1,876,-686, Kaltenbach experienced difficulty in securing this patent and it was granted only after he had amended his claims and after a searching examination, in the course of which practically all the patents cited here as anticipating were considered. Giving to the action of the Patent Office that weight to which it is entitled, and considering the evidence and the conclusions reached by the trial judge, we are of the opinion that the Kaltenbach patent, No. 1,920,402, is valid.

Although the pan extension used in the Newport News dumper was somewhat different in form from the pan extension in the Kaltenbach patent, being supported from above by means of a trolley while the Kaltenbach device was supported on an underneath carriage, the idea involved in both is the same and practically the same result is accomplished. Plaintiff's patent, No. 1,920,-·402, is infringed by the pan extension used in defendant's Newport News dumper.

Aside from anything based on disputed evidence, there are a number of undisputed facts that lead us to the conclusion that Kaltenbach's ideas as shown in the plans submitted to the defendant were used in the construction of the Newport News dumper. Kaltenbach's plans, submitted with the condition plainly shown on their face that they were given in confidence and were not to be used by anyone else, embraced substantial advances in the chute control and pan extension arrangements. In none of Brownhoist's plans, submitted prior to the time Kaltenbach's plans were disclosed to the defendant, was either idea included, and nothing resembling the Kaltenbach arrangements was suggested. All the Brownhoist proposals prior to September 3, 1930, were based on the design of the Port Richmond dumper and it was only after the Kaltenbach plans had come into the possession of the defendant that Brownhoist began to prepare blueprints covering the improvements finally approved and incorporated in the written contract of December 26, 1930.

On July 2, 1930, Kaltenbach was notified that the contract for the dumper had been let elsewhere, the contract was not finally agreed on and the plans approved for over five months. It is admitted that the original plans, as proposed by Brownhoist, were changed. It is not to be presumed that the officers and engineers of the defendant would not give careful study and consideration to any plans submitted by a bidder on a project of the magnitude of the one here involved. The novel ideas detailed in Kaltenbach's letter must have been gone over with great care, and the conclusion is inescapable that Brownhoist was directed to prepare specifications for mechanical arrangements for a pan extension and chute control of a like kind.

Kaltenbach's request, repeated but never complied with, that his plans be returned to him was, under the circumstances, a reasonable one. Two witnesses testified that they saw in the Brownhoist drafting rooms a blueprint, said by Kaltenbach to be similar to one left by him with defendant's chief engineer, with the name plate cut off.

The two devices in question were undoubtedly new to the experts of both the defendant and Brownhoist before they were disclosed by the Kaltenbach proposal of May 26, 1930, and after the defendant had

notice that a suit for damages would be brought, Taylor, vice-president of Brownhoist, applied for a patent and filed an interference against the Kaltenbach patent in the Patent Office. By this attempt to invalidate the Kaltenbach patent Taylor showed that he considered the device of value and patentable and evidently feared that it had been infringed in the construction of the Newport News dumper.

It is admitted that the price to be paid Brownhoist was increased in consideration of the adding of mechanical arrangements which, as we have concluded, embodied the Kaltenbach ideas. The contract was orally given to Brownhoist on plans following those of the Port Richmond dumper but was finally given in a written contract that included the substantial equivalents of the Kaltenbach devices.

A full discussion of the principles governing a similar situation, and a citation of the controlling decisions, will be found in Hoeltke v. Kemp Mfg. Company, 4 Cir., 80 F.2d 912, 923, where Judge Parker of this court said:

"Where, in advance of the granting of a patent, an invention is disclosed to one who, in breach of the confidence thus reposed, manufactures and sells articles embodying the invention, such person should be held liable for the profits and damages resulting therefrom, not under the patent statutes, but upon the principle that equity will not permit one to unjustly enrich himself at the expense of another. The question was before the Circuit Court of Appeals of the Seventh Circuit in the recent case of Booth v. Stutz Motor Car Company of America (C.C.A. 7th) 56 F.2d. 962, and we think that the decision there rendered is eminently sound and just. It would be a reproach to any system of jurisprudence to permit one who has received a disclosure in confidence to thus appropriate the ideas of another without liability for the wrong. * * *

"One who invites the disclosure of an invention, and thereafter begins to manufacture articles embodying the principle of the disclosure, labors under a heavy burden when he seeks to justify his action on the ground of independent invention, and he ought to offer something of a greater weight than the verbal testimony of interested witnesses. * * *

"Under such circumstances, we think that defendant should account to plaintiff for the profits realized from its sale of the infringing device prior to the grant of plaintiff's patent, not under the patent statutes, but under the long-recognized principle of equity that no man ought to be allowed to enrich himself unjustly at the expense of another."

The Kaltenbach ideas were wrongfully appropriated and embodied in the Newport News dumper.

The decree of the court below is affirmed.

Affirmed.