The **PORTER–CABLE MACHINE COM-PANY** and Rockwell Manufacturing Company, Plaintiffs,

v.

The **BLACK AND DECKER MANUFAC-TURING COMPANY**, Defendant.

Civ. A. No. 13791.

United States District Court
D. Maryland.

Oct. 23, 1967.

Norman P. Ramsey and Semmes, Bowen & Semmes, Baltimore, Md., and John D. Nies and Strauch, Nolan, Neale, Nies & Kurz, Washington, D. C., for plaintiffs.

Benjamin C. Howard and Miles & Stockbridge, Baltimore, Md., and C. Willard Hayes and Cushman, Darby & Cushman, Washington, D. C., for defendant.

HARVEY, District Judge:

In this action, the plaintiffs claim infringement of United States Patent No. 2,842,170 issued on July 8, 1958 and assigned by the named inventors to The Porter-Cable Machine Company, a New York corporation with its principal place of business located in Syracuse, New York. The patent in suit is for a saber saw structure, a saber saw being a portable, power-operated, hand-manipulated saw using a reciprocating saw blade, supported at only one end.[1]

In 1960, this patent was reassigned to one of the plaintiffs herein, The Porter-Cable Machine Company, a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania.[2] Thereafter, the latter corporation was merged into its parent, Rockwell Manufacturing Company which has been added as a party plaintiff and is now owner of the patent in suit. The plaintiffs seek an injunction against infringement of the patent, an accounting, damages and other relief.

The defendant is The Black and Decker Manufacturing Company, a competitor of Porter-Cable, located in Towson, Maryland. Defendant asserts the usual defenses of invalidity and non-infringement and in particular contends that the patent in suit is invalid (a) because the alleged invention was devised by one not named as the inventor; (b) because of obviousness; (c) because of overclaiming, and (d) because of indefiniteness of its claims.

## The Patent in Suit

Only claims, 1, 2 and 3 of the patent are still before the Court, claim 4 having been withdrawn by the plaintiffs. These claims are as follows:

"1. A saber saw structure comprising a base plate adapted to be moved on the surface of the work piece and being formed with an opening, a housing mounted on the base plate, a saw blade holder mounted for vertical reciprocation in said housing toward and from the base plate, a vertically disposed saw blade carried by said holder and extending downwardly through the opening in the base plate and being formed with teeth on its forward edge for cutting the work piece on its stroke toward the base plate, an insert positioned on said plate in registration with said opening therein, said insert having a surface extending substantially flush with the

---

1. A saber saw is sometimes also called a bayonet saw, a jigsaw or a scroll saw. However, in a conventional jigsaw or scroll saw, the blade is supported at both ends.

2. Both the New York corporation and the Delaware corporation will be termed "Porter-Cable" in this opinion. Before 1960, such designation will refer to the New York corporation and after 1960 to the Delaware corporation.

work engaging surface of the base plate and being formed with a saw blade receiving aperture positioned in close proximity to the sides of said saw blade, and said insert and base plate having means cooperable to detachably secure said insert to the base plate against vertical movement of said insert, said attaching means providing free floating limited lateral movement of said insert relative to the base plate.

"2. A saber saw structure as defined in claim 1, wherein the aperture in said insert is in the form of a slot extending inwardly from one edge thereof, and the insert being arranged on the base plate with the closed end of said slot confronting the back edge of the saw blade.

"3. A portable, power-operated, saber saw structure comprising a base plate adapted to engage the surface of the work piece and being formed with an opening having forward and rear portions and spaced apart side walls, a housing mounted on the base plate, a saw blade holder mounted for reciprocation in said housing toward and from the base plate, a saw blade carried by said holder and extending downwardly through the opening in said base plate, an insert, the side walls of the forward portion of said opening in the base plate being spaced apart to receive said insert, said base plate at the rear portion of said opening therein and said insert being provided with a tongue and groove formation for slidably interlocking the insert to the base plate, said tongue and groove formation being dimensioned to provide for limited free floating lateral movement of said insert relative to the base plate, said insert being formed with a saw blade receiving slot with the side walls thereof extending in close proximity to the sides of the blade and the closed end of the slot confronting the back edge of the blade, whereby the blade serves to maintain the insert in said rear portion of the opening in the base plate and the

tongue and groove formation in interlocking relation."

In describing the nature of the saber saw structure here involved, the specifications of the patent in suit note that the cutting edge of the saw blade is shaped to cut the material upon movement of the blade through the apertured base plate in a direction toward the housing. In other words, the base plate and the attached housing are placed on top of the work, and the saw blade cuts on the upstroke, pulling the material being cut against the base plate during such cutting stroke.

It is further stated in the specifications that saws of this general type have been developed as portable hand-manipulated machines for use for many cutting operations and that such machines are particularly advantageous in cutting panel material used for interior trim, table tops and the like. According to the specifications, such cutting tools universally have one disadvantage in that they chip the surface of the material engaged by the base plate of the machine. This chipping is caused by the teeth of the blade pulling upwardly or outwardly through the surface of the material being cut and when such material is used for cabinet work and the like the chipped edge is particularly unsightly. In machines of this type it is not practical to make the aperture in the base plate close-fitting to the sides of the saw blade due to variations and inaccuracies in the machining of parts of the machine, variations in the thickness of the blade used and lateral vibration of the blade during the cutting operation.

The specifications recite that the invention has as an object a saber saw structure embodying an arrangement effective to prevent chipping of the work piece by the saw blade. The invention has as a further object a power-operated saber saw structure including an insert mounted in the base plate and having free lateral movement relative to the base plate, the insert being formed with a saw blade receiving slot, the side walls

of which extend in close proximity to the sides of the saw blade.

It is defendant's position that the sole point of novelty in the invention, if any, is the loose or free floating fit of the insert in the base plate. Plaintiffs contend that the invention encompasses the entire combination, including the attaching means of the insert to the saber saw structure and the free floating yet secured relationship of such insert to the base plate.

## History of the Patent

During the period of the matters in suit, Porter-Cable and Black and Decker both produced a line of power-operated, woodworking tools. In 1953, Porter-Cable had a comprehensive line of power tools for sale to the professional woodworker except that it did not have among its products a portable, power-operated saber saw. At that time the outstanding saber saw in the field was the Scintilla (or Scinta), which was manufactured by a Swiss firm.

Late in 1953, Porter-Cable undertook to develop a portable saber saw which would surpass the Scintilla in performance. Two different saws were developed by its engineering experimental department: one, the so-called Papworth saw, developed under the direction of an employee named Walter Papworth, and the other, the so-called Bruck-Mittins saw, developed under the direction of John P. Bruck, a design engineer, with the assistance of Frank W. Mittins, an employee in Porter-Cable's engineering experimental department. Like the Scintilla saw, the Papworth saw employed a traditional reciprocating blade motion whereby the blade moved up and down in the same plane, cutting on the upstroke. However, the Bruck-Mittins saw adopted the novel concept of orbital motion. Orbital motion moves the blade into the work on the upstroke and backs it away on the return stroke, increasing the speed and ease of cutting. In spite of these marked advantages over the Scintilla saw, there was one substantial disadvantage which tests revealed would make the new orbital saw unacceptable to the public. Because of the aggressive action of the orbital motion, this saw badly splintered the veneer of the wood on the top of the work, and especially of plywood, which is a material customarily cut by saber saws. This splintering defect (termed "catastrophic" by one of plaintiffs' witnesses) caused the sales department of Porter-Cable to refuse to accept and market the Bruck-Mittins saw as originally presented around the first part of 1954.

Thereupon, Bruck and Mittins were assigned the task of curing the splintering defect. As early as June of 1954, they had developed the concept of using an insert to hold the fibers down while the saw blade was doing the cutting. By October 15, 1954, as noted by Mittins in an experimental report, a brass insert had been developed and tested with satisfactory results. A later experimental survey report dated November 8, 1954, compared tests of the Bruck-Mittins orbital saw with the Papworth and another reciprocating saw, noting that "the orbital tool, with the 'floating brass insert' seems to produce a slightly better cut as the insert tends to hold the wood fibers down while the blade is cutting." This report further stated:

> "In order to afford more bearing surface on either side of the blade, the Orbital saw has a removal (sic) brass insert which fits easily into the opening of the base. This tends to reduce chipping considerably (to a point whereby the saw cuts smoother than either of the 2 reciprocating saws), and was looked upon by the dealers as a good feature."

However, the report noted that the brass insert "wears" and suggested that the engineering department check this latter disadvantage.

After a review of this experimental survey, the Porter-Cable management decided to market the Bruck-Mittins saw using the newly-developed floating insert and to dispense with the Papworth saw. In subsequent months, certain refinements in the insert were made including the use of steel rather than brass

to avoid excessive wear, and in January of 1956 the saw was introduced commercially as Porter-Cable Model 148 at a price of $99.52.[3] On January 18, 1956, an application for a patent was filed with the United States Patent Office with Bruck and Mittins being named as the inventors.

In that first year, more than ten thousand saws having a retail value of over one million dollars were sold. In subsequent years, Porter-Cable introduced other models embodying the Bruck-Mittins concept, including the Model 152 and the Model 548. In 1957, 12,264 saws of these types were sold; in 1958, 21,993; and in 1959, 23,886.

By June of 1958, large quantities of Models 148, 152 and 548 had been marketed by Porter-Cable. In that month, a survey of competing saws was undertaken by Black and Decker, which did not at the time have a competitive saber saw on the market. An evaluation report dated June 9, 1958 noted the good finish cut provided by Porter-Cable's insert and further noted that Porter-Cable's saw was "the only orbital motion unit that does a good job of scroll cutting with a taper ground blade." [4]

Black and Decker's first attempt to compete successfully with Porter-Cable was by decreasing the slot width in the base of its functional model saw. In November, 1959, Black and Decker advertised for marketing its U–40 orbital saw which had a narrow slot and no insert in its base. Some U–40 saws of this design were manufactured, but none were ever sold. Subsequently, the U–40 was compared with the Porter-Cable and other competitive saws, and it was decided at a meeting held on February 26, 1960, that Black and Decker's model should be improved before it was manufactured in quantity. The minutes of the meeting of Black and Decker's Product Development Committee held on that date in particular noted that the Commit-

tee "would like to see improvement of splintering the top surface while cutting plywood."

George W. McCarty, Black and Decker's Vice President in charge of research and development, was assigned the task of working on the shoe design of the U–40 to minimize splintering. McCarthy sketched proposed solutions to the problem, one of such solutions being a rough copy of the Porter-Cable insert. Less than a month later, by March 13, 1960, a production drawing of an insert suggested by McCarty was produced. Thereafter, the U–40 was equipped with the Black and Decker insert and marketed. On August 25, 1960, an application for a patent was filed for a "self-aligning, anti-splintering insert for a shoe of jigsaw," with McCarty being named as the inventor. Patent No. 2,996,089 was issued on August 15, 1961, showing an insert rectangular in shape (compared to the circular form of the Bruck-Mittins insert).

When it learned that the modified U̅–40 saw equipped with the McCarty insert was being sold on the open market, Porter-Cable notified Black and Decker by telephone and later by letter dated January 27, 1961 of the Bruck-Mittins patent, claiming that Black and Decker was infringing. Porter-Cable also offered to enter into a license agreement with Black and Decker covering the Bruck-Mittins patent, and a copy of a proposed agreement was enclosed in such letter.

Black and Decker declined such offer and immediately set to work to develop yet another insert. About a month later, in March of 1961, production drawings were completed for this new insert, which was roughly rectangular in shape with rounded ears at the inner end. An application for a patent for an "anti-splintering resiliently retained insert for shoe of jigsaw" was filed on August 15, 1961 with George W. McCarty and Allen C. Stanley named as inventors. The patent was issued July 24, 1962, being No. 3,-

---

3. This price effectively limited the market to the professional user.

4. Scroll cutting involves intricate design work, including curved cuts of varying radii, and is one of the important uses of a saber saw.

045,725. This new insert was incorporated in Black and Decker's Models U–251 and U–351 saber saws which were thereafter marketed. In May of 1962, Porter-Cable filed this suit for infringement.

*Prior Art*

By way of patent anticipation, Black and Decker offered in evidence copies of the following sixteen United States patents:

| Inventor | Device | Number | Issuance Date |
|---|---|---|---|
| Fiedler | Filing Machine | 75,402 | March 10, 1868 |
| Wells | Machine for cutting cloth | 117,352 | July 25, 1871 |
| Schleicher | Circular Sawing-Machine | 202,668 | April 23, 1878 |
| Dearing | Machine for cutting patterns | 399,847 | March 19, 1889 |
| Edwards | Power feed sawing machine | 447,812 | March 10, 1891 |
| Deniston | Throat-piece for scroll or other saws | 461,325 | October 13, 1891 |
| Steinman | Reciprocating cutter | 1,164,669 | December 21, 1915 |
| Colby | Cutting and sawing device | 1,502,088 | July 22, 1924 |
| Hastings | Portable electric saw | 1,542,127 | June 16, 1925 |
| Hutchinson | Woodworking machine | 1,608,696 | November 30, 1926 |
| Cross | Scroll saw | 1,975,314 | October 2, 1934 |
| Tautz | Machine Table insert | 2,020,222 | November 5, 1935 |
| Boice | Jigsaw | 2,107,174 | February 1, 1938 |
| Christie | Work-supporting adjustable mandrel for band saws | 2,472,570 | June 7, 1949 |
| Forsberg | Motor driven reciprocating saw | 2,639,737 | May 26, 1953 |
| Papworth | Portable power driven reciprocable cutting tool | 2,775,272 | December 25, 1956 |

Only seven of these were cited as references in the file of this patent, namely, Dearing '847, Deniston '325, Steinman '669, Colby '088, Cross '314, Christie '570 and Forsberg '737.

In addition, defendant introduced in evidence and relied on a German patent, (Kramer, No. 826,640, dated January 3, 1952), a Deltacraft publication of the Rockwell Manufacturing Company, and the August, 1945 issue of Popular Mechanics in support of its defense of anticipation.

Because of the great number and variety of the devices relied upon by defendant, it is not possible to analyze and discuss each of these separately and in detail, nor is it necessary to do so for the reasons hereafter assigned. Each of these nineteen exhibits was discussed by witnesses and by counsel during argument. Colored charts and also models of a number of these devices were introduced in evidence at the trial. The Court has had an opportunity to examine the models and to review the patents, charts

and other exhibits in the light of the arguments and the briefs, and to compare them with the patent in suit. The finding of the Court is that the patent in suit is valid in view of the state of the prior art.

It should be noted for a full understanding of the nature of the invention here involved that the patent in suit discloses a hand-manipulated power saw with the blade operating with orbital motion which cuts on the upstroke, resulting in a splintering problem on the upper side of the work surface.[5] Many of the prior patents relied upon by the defendant are obviously inapplicable because they relate to devices with entirely different uses than the one here involved. For example, Wells '352 discloses a machine for cutting cloth with the cutting element being in the form of a band saw.[6] Separate plates are mounted on the platform at opposite sides of the slot through which the saw passes. The plates yield slightly to the side whenever cloth is dragged down into the slot by the cutter. Obviously, there is no anti-splintering function to these plates as cloth is the material being cut instead of plywood. Similarly, Fiedler '402 (a patent granted almost 100 years ago), is described as a machine for filing wood or iron "at different angles."[7] The specifications state that the wood to be filed should lie solid and close to the file to prevent the file from "tearing the wood." The patent does not state that the sliding plate (which defendant relies upon as being similar to the Porter-Cable insert) is in any way designed to prevent tearing of the wood. It is also clear that when the table is tilted, as it was designed to do, the plate would have to be clamped to prevent its sliding

into contact with the teeth, thus eliminating any float or looseness.

Other examples of prior art relied upon by defendant are equally inapplicable. Neither Schleicher '668 nor Edwards '812 (both of which disclose a circular saw) suggest any anti-splintering function. Dearing '847 is designed to cut fabrics, leather or similar material on the down stroke. Hastings '127 discloses the first true saber saw in the prior art, but does not have an anti-splintering insert. Hutchinson '696 (a stationary woodworking machine using a circular saw blade), Tautz '222 (a circular bench or table saw), and Boice '174 (a conventional jigsaw of the stationary type with the saw blade supported at both ends and having a tilting work table) all do not contain any reference to anti-splintering. Both Steinman '669 and Christie '570 were introduced in evidence by defendant solely because they were patents cited by the Examiner. They appear to have little pertinency to the issues in this case and are not seriously relied upon by defendant.

The most pertinent references would appear to be Deniston '325, Colby '088 and Forsberg '737. The Deniston patent, which was one of those cited by the Patent Office, is the only exhibit which discloses a mechanical device for preventing splintering of the surface of work cut by a saw. However, Deniston does not disclose a true saber saw inasmuch as the saw blade is supported at both ends. Furthermore, Deniston cuts on the down stroke and any anti-splintering function would, therefore, relate only to the underside of the work. As contrasted with the patent in suit, in Deniston, the work is placed on top of the throat piece. Although the specifications

---

5. The defendant argues that neither the patent nor the specifications mention or describe orbital motion. However, it is clear from the specifications that the invention relates to a reciprocating type saw blade which cuts on the upstroke with resultant chipping on the top surface of the work. Furthermore, the specifications incorporate by reference an earlier Bruck patent, No. 2,737,987, which

does describe orbital motion in some detail.

6. A band saw consists of an endless band or belt of metal sharpened at one or both edges to cut the material.

7. Although this patent is for an "Improved Filing Machine," it is noted that the machine can also be used for sawing.

state that the special purpose of the throat piece is to prevent tearing or breaking out of the wood on the underside of the piece worked by the saw, the evidence discloses that when the wood is placed on top of the throat piece the forward portion is depressed and any anti-splintering effect is reduced or eliminated. Defendant's witness McCarty conceded on cross-examination that as a result of the depression of the throat piece by the work on top, the Deniston concept would not be effective as far as anti-splintering is concerned inasmuch as the fibers of the work piece would be too far away from the point where the teeth of the blade emerge. He followed up such testimony by stating that it would be possible to alter the Deniston patent to provide an anti-splintering effect. It is clear therefore that although the Deniston patent recognizes the anti-splintering problem, it does not furnish an adequate solution along the lines suggested by the patent in suit. The insert disclosed here in the patent in suit, although retaining the advantages of being free floating, is so assembled as to remain during use in close proximity to the place where the teeth of the blade emerge from the work. When the machine is used in Deniston and the work is placed *on top* of the device, the opposite result obtains, as the forward portion of the throat piece is depressed and the throat piece is pushed away from the critical point where the teeth of the blade emerge.

Colby '088, also cited by the Patent Examiner, discloses a true saber saw, although in its normal use it differs from the patent in suit in that it cuts on the down stroke. There is no disclosure in the Colby patent of any anti-splintering device or function. Furthermore, the use of the keyhold aperture in the Colby insert defeats or lessens any anti-splintering effectiveness that the device might have.

Forsberg '737 discloses the first saber saw manufactured and sold in the United States. Although the patent shows a motor-driven reciprocating saw, it does not disclose an insert, a base capable of receiving an insert, nor an attaching means to hold the insert in place and retain it against undesired movement. For the purposes of this case, Papworth '272 may be considered to be identical to Forsberg.

The German patent discloses a tiltable and rotatable band saw table, having a hard wood disc insert with a normal fit so as to be easily removable. There is no disclosure of any anti-splintering function either in this patent or in the Rockwell Manufacturing Company publication which shows a conventional band saw and a conventional stationary jigsaw.

The Popular Mechanics publication in evidence is entitled "You Can Build This Sturdy Scroll Saw." It discloses an insert to be fitted within a table opening and specifies a free fit to permit insertion and removal of the insert. The article calls for a slot in the insert of one-quarter of an inch in width. The testimony indicates a slot of such width would have very little if any anti-splintering effect, nor does it appear that the insert was designed for any such purpose.

In summary then, although defendant has put in evidence in this case a great many examples of devices involving various types of saws or cutting machines, none of these devices either alone or in combination are sufficient to anticipate the invention which resulted in the patent here in suit. The volume of the prior art relied on by the defendant is in itself evidence of the weakness of its position. As the Fourth Circuit Court of Appeals said in Reynolds v. Whitin Mach. Works, 167 F.2d 78, 83–84 (4th Cir., 1948); cert. den. 334 U.S. 844, 68 S.Ct. 1513, 92 L.Ed. 1768 (1948):

"Defendant has cited 21 patents as basis for its contention that complainants' invention is lacking in novelty; and this in itself is evidence of the weakness of the contention. Such a citation of so many prior patents almost always means either that none of them is in point and that the patentee has brought together for the purpose of his invention devices to be found in prior patents of different

character, or that there have been prior attempts to solve the problem with which he was confronted which have not met with success. * * * [citations] * * * *Patents for useful inventions ought not be invalidated and held for naught because of such excursions into the boneyard of failures and abandoned experiments.*" (Emphasis added)

### Validity

35 U.S.C.A. § 282 provides that a patent shall be presumed valid and that the burden of establishing invalidity rests upon the party asserting it. As Judge Watkins said in Collins v. Kraft, 144 F.Supp. 162, at page 168 (D.Md., 1956):

> "The statutory presumption of validity from the issuance of a patent means that 'the burden of proving want of novelty is upon him who avers it * * * but his burden is a heavy one, as it has been held that "every reasonable doubt should be resolved against him." ' Mumm v. Jacob E. Decker, 1937, 301 U.S. 168, 171, 57 S.Ct. 675, 676, 81 L.Ed. 983."

### (a) *The Named Inventors.*

■ A patent is invalid if granted on the application of a person who was not in fact the original and first inventor of the improvements purporting to be covered by the patent. 35 U.S.C.A. § 102; Sanford Inv. Co. v. Crab Orchard Improvement Co., 25 F.Supp. 575 (S.D. W.Va.1938), affirmed 104 F.2d 347 (4th Cir., 1939). 35 U.S.C. § 115 provides that the applicant for a patent shall make oath that he believes himself to be the original and first inventor of the device for which he solicits a patent.

■ Defendant claims that the actual inventor here was Dane Pedersen and not John P. Bruck and Frank W. Mittins who where named as inventors in the patent in suit. The evidence on this issue is conflicting. However, the grant-

ing of letters patent raises a prima facie presumption that the named persons were inventors of the patented device, and the burden is upon the defendant to show otherwise by strong, clear and convincing evidence. Pacific Scientific Company v. Aerotec Industries of California, 243 F. Supp. 390 (S.D.Cal.1965).

On September 27, 1963, the deposition of Dane Pedersen was taken by the attorneys for the defendant in this case. Portions of this deposition have been admitted in evidence. Pedersen, whose employment was terminated in 1961, was originally hired by Porter-Cable as a technician in 1950, and he was performing such duties in 1955. Pedersen stated that he worked closely with Bruck in connection with the development of this saber saw. He conceded that Bruck was "the designer" of the saw, but said that after Bruck left the Company in March of 1955, he, Pedersen, was asked to improve on the idea of the insert. Pedersen testified that shortly before June of 1955 he accidentally discovered the effectiveness of mounting the insert in such a way that it would permit free floating lateral movement. He further testified that as far as he knew, Mittins did not contribute anything to the design of the insert.

In further support of its position that Bruck and Mittins were not the true inventors, defendant relies on the deposition testimony of Mittins himself which also was admitted in evidence at the trial. Mittins was deposed on May 23 and 24, 1963. He testified that shortly before June of 1955 he worked with Bruck and helped Bruck develop the insert in the form in which it was finally patented.[8] Inasmuch as it is not disputed that Bruck left the employ of Porter-Cable in March of 1955, defendant argues that on the basis of Mittins' testimony the concept of the loose fit must have been developed after Bruck left and that therefore Bruck was not one of the inventors.

---

8. Mittins therefore contradicts Pedersen's testimony that Pedersen alone first developed the idea of a lose fitting insert.

Defendant states that as to this part of his testimony Mittins was "obviously mistaken."

Contrasted with this testimony taken by way of deposition is the testimony in court of Matthew Patulski, that the invention was substantially complete by November, 1954.[9] Such testimony is supported by the experimental report dated November 8, 1954 which clearly indicates that the floating insert had been developed by that date and that only minor modifications were required thereafter.

Lloyd B. Benham, Porter-Cable's Vice President in charge of Engineering, testified by way of deposition that Bruck and Mittins were the joint inventors. He based his conclusion on his day-to-day observation of their work. It should further be noted that both Bruck and Mittins took the formal oath attached to the original application that they were the original, first and joint inventors of the saber saw structure covered by the patent.

In resolving this conflict in testimony, this Court notes that Mittins' deposition was taken some eight years after he was engaged in working on this invention. Both parties agree that Mittins is in error in testifying that Bruck was still with Porter-Cable in June of 1955 when Mittins says they were working on the invention. It does not necessarily follow from Mittins' recollection of events eight years before that Bruck had nothing to do with the basic concept of a loose fitting insert. A more reasonable explanation of the Mittins testimony is that he recalled having worked with Bruck on the invention, but eight years after the work had been done, he could not precisely remember the date of such work and placed it in June of 1955 rather than in October or November of 1954.

Pedersen's testimony that he was the first one to develop the concept of the loose fit is contradicted by Mittins, Patul-

ski, and Benham. Of even greater weight is the written Porter-Cable experimental report of November 8, 1954 which clearly shows that the idea of a floating insert had been developed by that date.

■■ After careful consideration of the testimony and exhibits, this Court finds that, as shown by the weight of the credible evidence, Bruck and Mittins were in fact the original and first inventors of the improvements covered by the patent in suit. The defendant has produced no clear and convincing evidence to the contrary.[10]

### (b) *Obviousness.*

Two recent decisions of the Supreme Court discuss the requirement under 35 U.S.C.A. § 103 that a patent to be valid must be non-obvious, namely, Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), and United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). As Mr. Justice Clark said in the *Graham* case, 383 U.S. at pages 17–18, 86 S.Ct. at page 694:

"While the ultimate question of patent validity is one of law, Great A. & P. Tea Co. v. Supermarket Equipment Corp., supra, 340 U.S. 147 at 155, 71 S.Ct. 127, [95 L.Ed. 162] the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commer-

---

9. Patulski held two positions at the time: Manager of New Products Development and Market Research Manager.

10. Having conceded that Bruck was the designer of the saw, Pedersen can in any event claim to be no more than a joint inventor of the combination disclosed by the patent in suit. Misjoinder or non-

joinder of a joint inventor does not invalidate a patent if the error can be corrected as provided in 35 U.S.C.A. § 256. That Section permits the Commissioner to make such a correction if a person not named in a patent was a joint inventor, but was omitted by error and without deceptive intention on his part.

cial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."

■ It is clear that the validity of a patent turns on the facts of each particular case. *Graham,* supra, at page 5. As previously discussed, the prior art does not provide any obvious solution for the problem confronting Porter-Cable when it decided to explore the possibility of marketing a saber saw using orbital motion. Indeed, there is no indication that the problem itself had ever been presented in the frame of reference in which Bruck and Mittins undertook a solution. Splintering on the top surface of intricate scroll work is a problem of much greater magnitude than splintering on the under surface of the material being cut. Use of a close-fitting, securely attached insert was no solution because of the difficulty in manufacturing parts of the saw (including the blades) with the extreme accuracy necessary for such a close fit. What was required was a device which though limited in movement, would move in all directions, laterally, backwards and forwards and up and down, but which would still furnish such firm support for the material at the point where the blade did the cutting that splintering would in effect be eliminated. Extensive experimentation and testing by Bruck and Mittins resulted in the invention of just such a device which, when combined with the other elements of a saber saw employing a reciprocating saw blade, constitutes the patent in suit.

Defendant's claim that the concept of the invention is a simple one and that it is obvious from the prior art is no more than the exercise of the "20–20 vision of hindsight." See O. M. I. Corporation of America v. Kelsh Instrument Co., 173 F.Supp. 445, 457 (D.Md., 1959), affirmed 279 F.2d 579 (4th Cir., 1960). As stated in Florence-Mayo Nuway Co.

v. Hardy, 168 F.2d 778, 781 (4th Cir., 1948) :

"Knowledge after the event is always easy, and problems once solved appear as never having presented difficulty."

As previously noted, defendant places considerable reliance on the deposition testimony of Pedersen which was admitted in evidence in this case. This Court has rejected such testimony in support of defendant's position that Pedersen was the true and only inventor. However, portions of Pederson's testimony do serve to support plaintiffs' position that the invention was not an obvious one.

Pedersen was employed by Porter-Cable as a technician until 1955 and a research engineer until 1957. He claimed in his testimony that the free floating mounting of the insert in the base plate was his discovery. As a person of ordinary skill in the art, Pedersen's first attempted solution of the problem was to reduce movement of the insert by actually fastening the insert to the base plate. Such an experiment proved unsatisfactory. Continued efforts finally resulted in a nylon insert and "by accident I found out that we had a lot of play in the blade moving back and forth". Having accidentally made the insert too loose, Pedersen noted that the insert operated more satisfactorily because of such motion.

As this Court has previously found, the free floating characteristic of the insert was developed in the fall of 1954 as a result of many months of experimentation by Bruck and Mittins. By accident Pedersen duplicated what had been discovered months before and successfully tested by his employer. Pedersen's testimony shows that the application of ordinary skill in the art not only would not lead to the invention as finally patented but in fact would lead in the opposite direction. That Pedersen fortuitously stumbled on the solution suggests that it was not an obvious one.

Not only does this invention contain the primary attributes of non-obviousness, but also it satisfies the secondary considerations of commercial success and

immediate imitation. The marketing of a power saw embodying the invention here in suit met with instant and substantial commercial success. Furthermore, defendant at once undertook to imitate its competitor's successful product. When defendant's first response was challenged, it immediately abandoned this answer to the problem and set out to devise another and safer means of providing competition without facing liability for infringement. In other words, in this case defendant undertook to imitate its competitor's product not just once but on two separate occasions. This tribute of imitation paid by the defendant buttresses the presumption of validity of the patent in suit. As Judge Watkins said in O. M. I. Corporation of America v. Kelsh Instrument Co., supra, 173 F. Supp. at page 457:

> " * * * This Circuit has often emphasized the great weight, on the question of validity, that should be accorded the flattery of imitation; that the presumption of validity is further buttressed when the one attacking validity 'gives the tribute of its praise to the prior art' but gives to the patent 'the tribute of its imitation.' Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 441, 31 S.Ct. 444, 450, 55 L.Ed. 527; Ackermans v. General Motors Corp., 4 Cir., 1953, 202 F.2d 642, certiorari denied 1953, 345 U.S. 996, 73 S.Ct. 1139, 97 L.Ed. 1403, rehearing denied 1953, 346 U.S. 842, 74 S.Ct. 16, 98 L.Ed. 362; Florence-Mayo Nuway Co. v. Hardy, 4 Cir., 1948, 168 F.2d 778, 782."

After considering all of the evidence presented, this Court concludes that the combination here clearly transcends the art of a skilled mechanic, and it is this Court's finding that such combination amounts to a genuine invention.

### (c) *Overclaiming.*

Relying on Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008 (1938), defendant contends that plaintiffs' action in claiming old and separately usable elements of a tool in combination with the improved element renders the patent wholly invalid. In that case the Supreme Court said the following at page 549–550, 58 S.Ct. at page 664–665:

> " * * * The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention. And the improvement of one part of an old combination gives no right to claim that improvement in combination with other old parts which perform no new function in the combination."

The evidence discloses that although there are old elements in the patent in suit, it is not composed entirely of an aggregation of old parts or elements.[11] The invention here includes new and improved elements which have been combined with the old and which in combination perform new and different functions than theretofore performed. As previously discussed in considering the prior art, the earlier patents nowhere disclose or suggest the entire combination making up the invention here, including base plate and housing, blade holder and saw blade, and insert and attaching means providing free floating limited lateral movement of the insert relative to the base plate.

Defendant argues that Porter-Cable should have sought to patent only the insert as did McCarty on two separate occasions. The simple answer to this contention is that the invention here is not the insert alone, but is in fact the entire combination including the insert as positioned in relation to the other parts of the saw. Unless the claims in-

---

11. Even if a device is a mere combination of elements known in the prior art, it may be patentable when it produces a new and different result. Heyl & Patterson, Incorporated v. McDowell Company, 317 F.2d 719, 722 (4th Cir., 1963).

clude the proper positioning of the insert in relation to the base plate and the saw blade so as to provide free floating limited lateral movement relative to the base plate, the invention cannot accomplish the objects set forth in the patent specifications.

■ When the Porter-Cable saw is used with the insert, the insert and the other elements of the saw are mutually interdependent and embody the patent. Claiming of the entire combination does not under such circumstances constitute overclaiming. Of course, when used without the insert to cut metal, plastic, tile or other materials that do not present a splintering problem, the saw is not covered by the claims of the patent in suit.

### (d) Indefiniteness.

■ It is provided in 35 U.S.C.A. § 112 that the specification of a patent shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention. The statutory requirement of particularity and distinctness in claims is met when they clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise. United Carbon Company v. Binney & Smith Co., 317 U.S. 228, 236, 63 S.Ct. 165, 87 L.Ed. 232 (1942).

The defendant contends that the claims of the patent in suit are invalid because they use the term "free floating limited lateral movement" at the exact point of alleged novelty of the invention. Particular emphasis is placed by defendant on the fact that the file wrapper of the patent in suit shows that the words "free floating" were inserted in the claim by amendment after the application had originally been rejected.

Examination of the record of the prosecution of the patent in suit discloses that the original application filed with the United States Patent Office on January 18, 1956 included five separate claims. On September 25, 1956, the Examiner rejected all five claims as being unpatentable. In three separate places the specifications stated that the insert had "free lateral movement" relative to the base plate. Claim 1 of the original application stated that the insert had "limited movement relative to the base plate in a plane parallel thereto"; claim 2 stated that the attaching means provided "limited lateral movement of the insert", and claim 4 stated that the insert was mounted for "limited movement relative to the base plate in a plane parallel thereto". The drawings give examples of what was meant by free limited lateral movement.

An amended application was filed on January 2, 1957. Claims 1 through 5 were amended and new claims 6 and 7 were added. The word "floating" was used for the first time by insertion in the original claim 2 and was included in the new claims 6 & 7. In the patent attorney's argument in support of the amended application, it was made clear that the word "floating" was used as a synonym for "move" and further argument described the extent of the movement of the insert with respect to the base plate.

On October 22, 1957, the Examiner again rejected claim 1, allowed claims 2 & 3, rejected claims 4 & 5 as not being patentably distinct from claims 2 & 3, and rejected claims 6 & 7 as being indefinite in that there was no antecedent for certain terms used in these claims.[12] The Examiner stated that if claims 6 & 7 were amended to provide the necessary antecedents, these claims would probably be allowable. Thereafter, such amendments were submitted, resulting in the allowance of the four claims contained in the patent as issued on July 8, 1958, being claims 2, 3, 5 and 6 of the amended application.

■ Study of the file wrapper clearly discloses that the amended application included no change in the original concept of the invention. In the amended ap-

---

12. Such terms are not material to the issues in this case.

plication claim 2 called for "free floating limited lateral movement of the insert" while claim 4 provided for "limited lateral movement". Obviously the Patent Examiner considered these two expressions as substantially the same in that claims 4 & 5 of the amended application were rejected as not being patentably distinct from the allowed claims 2 & 3. When considered in the light of the entire file, the addition of the words "free floating" in the amended application does not make the claims indefinite or indistinct. A number of different equivalent expressions were used to describe the concept and to distinguish what was claimed in the patent from what went before in the art.

Defendant's principal attack is directed towards the words "float" and "floating". Its position is considerably weakened by the fact that its own Vice President, McCarty, did not find these words indefinite but in fact used one or both of them in both of his patent applications. In the application which resulted in the issuance of McCarty '089, it was stated that "the insert 10 will be allowed 'to float' with respect to the blade 15". In the application for the later patent, McCarty '725, reference was made to "the continuous loose, lateral play of the insert, sometimes referred to as 'free floating'", and the earlier Bruck and McCarty inserts were identified as of the "free floating" type.

For these reasons, this Court concludes that the claims here are sufficiently distinct to satisfy the requirements of 35 U.S.C.A. § 112. Even if there were some doubt in this regard as to the claims involved here, as the Fourth Circuit Court of Appeals said in Reynolds v. Whitin Mach. Works, supra, 167 F.2d at page 85, this Court "would construe them in the light of the specification and drawings to save a meritorious patent". In Lever Bros. Co. v. Proctor & Gamble Mfg. Co., 139 F.2d 633, 639 (4th Cir., 1943), the same Court noted that

" * * * inventors should not be deprived of their labors by too technical nicety in the requirement that inventions must be adequately described to indicate their real scope and their true content."

### Infringement

As previously noted, after the insert was developed which was later incorporated in McCarty '089, Black and Decker's U–40 saw was equipped with such insert and marketed. This insert will be referred to as the "original insert". After Porter-Cable claimed that the U–40 saw with the original insert infringed the patent in suit, another insert was developed and later patented as McCarty '725. This new insert, referred to herein as the "revised insert", was incorporated in Black and Decker's models U–251 and U–351 saws.

Plaintiff claims that both the original and the revised inserts infringe claims 1, 2 and 3 of the patent in suit. As stated in Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1949), if "accused matter falls clearly within the claim, infringement is made out and that is the end of it." Under the doctrine of equivalents, even if the accused structure avoids the claims when literally interpreted, it infringes if it performs substantially the same function in substantially the same way to obtain the same result. Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147 (1929).[13]

13. Defendant, invoking the theory of file wrapper estoppel, contends that the doctrine of equivalents is in no way applicable to the present case, relying on Carter Products, Inc. v. Colgate-Palmolive Company, 269 F.2d 299 (4th Cir. 1959). The argument that Porter-Cable is estopped by the position it took in the Patent Office from claiming that the invention is anything more than the loose fit of the insert in the base plate has been fully answered in earlier portions of this opinion, wherein this Court analyzed the record of the prosecution of the patent in suit and reached the conclusion that the amended application did not change the basic concept of the invention. File wrapper estoppel therefore does not apply in the present case.

### (a) *The Original Insert.*

As provided in the pretrial order, defendant has admitted that all of the elements and features of claims 1, 2 and 3 of the patent in suit are present in its accused saw when fitted with the original insert with the exception of the words "substantially flush" in claims 1 and 2, describing the relationship of the work engaging surface of the base plate and the insert, and the words "free floating" in all three claims, describing the movement of the insert relative to the base plate. It is further stipulated in the pretrial order that the bottom surface of the original insert, when fitted into the base plate of the U–40 saw, is between .010 inch and .015 inch below the work engaging surface of such base plate when assembled rather than coplanar therewith. Defendant argues that under such circumstances the original insert when fitted in its U–40 saw is not substantially flush with the work engaging surface of the base plate and, accordingly, does not infringe the patent in suit.

In the original application for the patent in suit, claim 1 (listed therein as claim 2), described the insert as "having a surface extending flush with the work engaging surface of the base plate * * *." In the amended application, the word "substantially" was added before the word "flush", and the reason for the change was stated as follows:

"Claim 2 has been amended to locate the bottom surface of the insert substantially flush with the bottom surface of the base plate. This is done to avoid an unnecessary limited construction being placed upon the claim."

A clear intention was therefore expressed in the amended application to avoid the restricted and technical construction which defendant now places on the words "substantially flush". The evidence indicates that the fact that the original insert may extend about one one-hundredths of an inch below the work engaging surface of the saw does not interfere with or change the functioning of the saw in any material way. The finding here is that defendant's original insert does in fact extend substantially flush with the work engaging surface of the base plate of defendant's saw.

The origin of the term "free floating", which appears or is incorporated by reference in all three claims of the patent in suit, was previously discussed in this opinion. It should be noted that in the specifications of McCarty '725, the patent issued for the revised insert, reference was made to the prior art including both the patent in suit and McCarty '089 covering the original insert, as "prior art anti-splintering inserts of the 'free floating' type." In fact, an object of McCarty '725 was stated to be to alleviate the difficulties associated with inserts of the free floating type by providing a resiliently retained insert. In other words, at the time that the application was filed for a patent for the revised insert McCarty himself agreed that the original insert was of the free floating type. Little credence can under such circumstances be given to defendant's present contention that its original insert as positioned in its U–40 saw was not free floating.

In any event, the evidence clearly shows that when the original insert is fitted in defendant's saw there is limited free floating lateral movement of the insert. For the reasons stated, it is the opinion of this court that defendant's model U–40 saw fitted with the original insert infringes the patent in suit.

### (b) *The Revised Insert.*

As shown by the testimony, when its U–40 saw with the original insert was charged with infringement, defendant immediately went to work to avoid the charge by means of a new device. Initially, McCarty proposed a substantial modification of the original insert to provide for resilient side arms. However, in order to save time and expense, it was decided to merely alter the existing mold of the original insert. McCarty's initial proposals for substantial changes in the original insert were abandoned and slight alterations in the mold of the original insert were made to come

up with the revised insert. In other words, defendant deliberately chose not to depart substantially from the basic design of the original insert because to do so would take longer and would be more costly. That a minimum of experimental and testing work was involved in development of the current insert is indicated by the fact that some six weeks after receiving notice of infringement, the original insert had been revised and drawings had been prepared to show the necessary dimensions. Within eight weeks the revised insert had replaced the original insert in actual production. Whatever saving of time and expense resulted, such facts suggest that defendant did not do all that it might have done to develop a device which would avoid infringement of the patent in suit.

As to the revised insert, the pretrial order states that the defendant has admitted that all of the elements and features of Claims 1, 2 and 3 of the patent in suit are present in its accused saw when fitted with such insert with the exception of the words "substantially flush" in claims 1 and 2 describing the relationship of the work engaging surface of the base plate and the insert, and the words "free floating" and "lateral" in all three claims, describing the movement of the insert relative to the base plate. As to claim 3, an additional exception is noted as to the words "whereby the blade serves" describing the means of maintaining the insert in the rear portion of the opening in the base plate and the tongue and groove formation in interlocking relation. The same stipulation has been made as to the bottom surface of the revised insert being between .010 inch and .015 inch below the work engaging surface of the base plate of defendant's saw.

As to the "substantially flush" exception in the pretrial order, what has previously been said with reference to the original insert likewise applies to the revised insert. For the same reasons, it is concluded that the revised insert, when fitted in defendant's saws, has a surface extending substantially flush with the work engaging surface of the base plate.

It is provided in the specifications that one of the objects of McCarty '725 covering the revised insert was to provide a "resiliently retained insert that has a limited pivoting movement in the plane of the insert." Defendant contends that the device in fact attains this objective and, therefore does not, when fitted in its saws, have free floating lateral movement.

In terms of the function of the device, the evidence shows that during the operation of the saw the revised insert freely floats or moves laterally in response to the action of the saw blade. What is described in the patent as the resilient holding feature is remote from the saw blade. As a result, in the vicinity of the blade itself there is freedom of movement or float so that the insert moves readily from side to side to conform with the blade. Such looseness attains the objectives of the patent in suit in permitting variations and inaccuracies in the machining of parts and in providing for proper cutting operations, while still performing an anti-splintering function. Whether the movement of the revised insert can be properly described as pivotal or otherwise is not material in terms of the function of the device. Defendant's roughly rectangular insert with ears may be quite different in appearance from Porter-Cable's circular insert. However, when placed in a saw, the revised insert moves or floats in the same manner as does the circular insert. This Court is of the opinion that the revised insert is fitted in defendant's saws in such a manner as to constitute an attaching means providing limited free floating lateral movement.

Nor is there merit to defendant's final contention that its device does not infringe because the revised insert remains in place when the saw blade is removed. Both Porter-Cable's and defendant's inserts were designed for use *during* sawing operations. When the saw blades are in place and ready for

operation neither the revised insert nor Porter-Cable's insert can be removed. It is therefore clear that the saw blade of defendant's saw, like that of Porter-Cable's, serves to maintain the insert in place in the opening in the base plate. The fact that the ears of the revised insert serve a similar purpose when the saw blade is removed is not material to the issue of infringement.

As the court said in Chesapeake and Ohio Ry. Co. v. Kaltenbach, 95 F.2d 801, 804 (4th Cir., 1938), if the infringing device "performs the same function as the patented device, it is immaterial that it also performs some other function. It is still * * * an appropriation of the patented invention."

This Court concludes that defendant's U-251 and U-351 saber saws with the revised insert infringe claims 1, 2 and 3 of the patent in suit. As this Court said in Ransburg Electro-Coating Corp. v. Proctor Electric Co., 203 F.Supp. 235, 258 (D.Md.1962):

"The inventive ideas of plaintiff have been appropriated; supplementation or modification, even if an improvement, will not avoid infringement * * *."

### Damages

 In the pretrial order, it was provided that all matters relating to damages would be reserved for later determination in the event that plaintiffs prevailed in this action. In addition to ordinary damages, plaintiffs seek treble damages and reasonable attorneys' fees under 35 U.S.C.A. §§ 284 and 285, on the grounds that defendant's infringement was deliberate and wilful. As the facts relating to these contentions were not fully developed at the trial, these issues will likewise be reserved for later determination.[14]

---

14. For example, when defendant was notified by Porter-Cable that the original insert infringed the patent in suit, it obtained a report on the subject from its patent attorney which, after being offered in evidence, was withdrawn by defendant following an objection by the

### Findings

This Court finds as facts and rules as a matter of law that:

1. Claims 1, 2 and 3 of Patent No: 2,842,170 are valid.

2. The defendant's U-40 saber saw with the original insert and the defendant's U-251 and U-351 saber saw with the revised insert each infringe claims 1, 2 and 3 of Patent No. 2,842,170.

This Court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure are embodied in the aforegoing opinion, whether or not expressly so characterized.

Counsel will prepare and submit within ten days an appropriate order.

plaintiffs. Whether defendant received advice of counsel before developing its infringing device and the extent of such advice is of course relevant to the question whether the infringement was deliberate and wilful.